COMMITTEE ON PROFESSIONAL ETHICS AND GRIEVANCES OF THE VIRGIN ISLANDS BAR, PETITIONERS

v.

ALPHONSO A. CHRISTIAN, Respondent

Civil No. 125-1960

District Court of the Virgin Islands

Div. of St. Thomas and St. John

January 31, 1961

*See, also, 191 F. Supp. 87*

DAVID E. MAAS, ESQ., Chairman, WILLIAM H. D. COX, ESQ.
and CROXTON WILLIAMS, ESQ., members, Committee on
Professional Ethics and Grievances, Charlotte Amalie,
Virgin Islands, *for petitioners*

FRANCISCO CORNEIRO, ESQ., Charlotte Amalie, Virgin Islands, *for respondent*

GORDON, *District Judge*

This is an action brought by the Committee on Professional Ethics and Grievances of the Virgin Islands Bar, Integrated, hereinafter called the petitioners or the Grievance Committee, against Alphonso A. Christian, Esquire, a practicing attorney, hereinafter called the "Respondent", alleging unethical conduct on the part of said attorney and a violation of the Canons of Professional Ethics, and praying that the said attorney be disciplined in such manner and to such extent as the Court deems reasonable and just under the circumstances.

The alleged unethical conduct is a result of the preparation of a document entitled "Agreement Transferring Prop-

erty As Heir Apparent"[1] by Attorney Christian and the circumstances and conditions surrounding the execution of said document in his law office by one Lillian Mills, the only heir apparent.

On March 2, 1956, an Order of Integration of the Virgin Islands Bar was entered in this Court and rules for the organization and operation of the Integrated Bar were established. These rules provide for the Committee on Professional Ethics and Grievances, (Vol. II, Title 5, Appendix VI, V.I.C., Rule 54(h), page 356), and for the procedure to be followed by the said Grievance Committee (Vol. II,

---

[1] "AGREEMENT TRANSFERRING PROPERTY AS HEIR APPARENT

"KNOW ALL MEN BY THESE PRESENTS:

"That, for and in consideration of the sum of $1.00 (One Dollar), U.S. Currency, and for other good and valuable considerations, the receipt whereof is hereby acknowledged, I, LILLIAN MILLS, a single woman, of St. Thomas, Virgin Islands, on this 19th day of May, A.D., 1958, at St. Thomas, Virgin Islands, hereby agree to convey, grant and transfer, and by these presents do convey, grant and transfer unto Warren Hendricks, Theophilus Larson, and Edith Thomas, all residents of St. Thomas, Virgin Islands; and to Dorothy Sewer Birch and Liston Sewer, both residents of New York, N.Y., share and share alike, all such property, real and personal and mixed, wherever situated, as I may inherit or come into possession or ownership of as heir at law or testamentary heir from my sister, LUCILLE MILLS SEWER, of St. Thomas, Virgin Islands, now seriously ill and hospitalized at the Knud Hansen Memorial Hospital.

"IN WITNESS WHEREOF, I have hereunto subscribed my name and affixed my Seal this 19th day of May, A.D., 1958, at Charlotte Amalie, St. Thomas, Virgin Islands.

"/s/ Lillian Mills    (Seal)
"Lillian Mills

"Signed, sealed and delivered
in the presence of:
"/s/ Alphonso A. Christian
"/s/ Barbara T. Christian
"/s/ Helen Jarvis

"TERRITORY OF THE VIRGIN ISLANDS)
"District of St. Thomas              ) ss: Acknowledgment

"BE IT REMEMBERED that on this 19th day of May, A.D., 1958, before me personally appeared LILLIAN MILLS, to me personally known and known to me to be the person who executed the foregoing instrument, and after explaining to her the full import and effect of the said instrument, she did acknowledge that she executed the same freely and voluntarily for the purposes therein stated.

"/s/ G. de Castro
NOTARY PUBLIC"

Title 5, Appendix VI, V.I.C., Rule 57(b), page 359). The complaint was filed in accordance with these rules.

The Rules of Integration further provided that the Canons of Professional Ethics adopted by the American Bar Association shall constitute the Code of Ethics to be followed by the Members of the Virgin Islands Bar, Integrated (Vol. II, Title 5, Appendix VI, V.I.C., Rule 57 (a), page 358).

■ Further, this Court has jurisdiction of the admission of attorneys at law to practice in the courts of this Territory and over the disciplining of persons so admitted and to make rules and regulations governing the practice of law in the Territory (Vol. I, Title 4, V.I.C., Section 441, page 304).

The complaint was filed on July 14, 1960, and summons and copy of the complaint were served on the respondent on July 15, 1960.

On August 6, 1960, the respondent filed an answer with Francisco Corneiro, Esquire, as his attorney, denying that he is guilty of unethical conduct or conduct contrary to the Canons of Professional Ethics.

A Pre-Trial Conference was held on October 25, 1960, in which the respondent and his counsel requested the Grievance Committee to cite the specific canons of ethics the said respondent is alleged to have violated. On October 26, 1960, the Grievance Committee cited Canons Nos. 6, 8, 15, 16, 32 and 41 of the Canons of Professional Ethics as the Canons violated.

On November 21, 1960, Francisco Corneiro, Esquire, attorney for respondent, filed an amended answer which denied "each and every allegation of the complaint which in any way states, indicates or implies that the defendant at any time committed and is guilty of conduct which was unethical and contrary to the Canons of Professional

Ethics, and specifically Canons Nos. 6, 8, 15, 16, 32 and 41", and prayed that the complaint be dismissed.

The matter came on for hearing on November 28 and 30, 1960; appearing, Attorneys David E. Maas, Chairman of the Grievance Committee, William H. D. Cox and Croxton Williams, on behalf of the Grievance Committee, and Attorney Alphonso A. Christian with counsel Francisco Corneiro, Esquire. Testimony was adduced from witnesses for petitioners and respondent; argument had and the case taken under advisement.

In order to have a factual picture of the circumstances and conditions surrounding the execution of the document in question and the conduct of the respondent thereafter it is necessary to be somewhat verbose and to show in detail the facts alleged and denied.

The Report of the Grievance Committee, on which the complaint is based, alleged the facts to be as follows:

"On or about May 18, 1958, Attorney Christian received a telephone call from someone other than Lucille Mills Sewer, requesting that he come to the home of Mrs. Sewer apparently to draw a will. When he arrived there, he found Mrs. Sewer in bed and suffering from an illness from which she subsequently died. She advised him that she did not want to talk to him at that time and to come again. He left without learning what she wanted to do with her property. Consequently, Attorney Christian was not following any wish expressed by Mrs. Sewer in what he did.

"The next day Mrs. Sewer was in the Knud-Hansen Memorial Hospital and Attorney Christian went to the hospital, apparently for the purpose of drawing a will. He found her to be in no mental condition to make a will, so that again he left without any knowledge of what she desired to do with her property. He stated that on May 19, 1958, in the morning of that day, he saw Miss Mills, together with one or more of the defendants[2], and, at the time, he understood Miss Mills to say that she would deed over all the property which she would inherit from Mrs. Sewer, her sister, to the defendants[2].

[2] Warren Hendricks, Theophilus Larsen, Edith Thomas, Dorothy S. Birch and Liston Sewer referred to in Civil No. 154–1958 (Mills v. Hendricks (D.C. V.I. 1959) 4 V.I. 19).

"Miss Mills denies that any such conversation was held, and denies meeting Attorney Christian on the morning of May 19, 1958. He did not question her as to what assets she had or what her source of income was, and had no knowledge, therefore, of whether such a transfer would impoverish Miss Mills. He knew that Mrs. Sewer, Miss Mills' sister was dying in the hospital, and should have known that, under such circumstances, it would be difficult for a person of the type of Miss Mills to think clearly.

"Later during the same day, Attorney Christian drew up the agreement for Miss Mills to sign, the effect of which was to agree to transfer to the defendants[2] all the property which she would inherit from her sister, Mrs. Sewer, who evidently was about to die intestate.

"During the afternoon of May 19, 1958, the defendants[2] appeared at Attorney Christian's office with Miss Mills. They had come directly from the hospital where Miss Mills had been spending time with her dying sister.

"Attorney Christian says that he read the agreement to Miss Mills and explained to her the effect of signing the document in that it would obligate her to transfer the title of all the property which she would receive upon the death of her sister to the defendants[2], and that Miss Mills signed the document after receiving this explanation from Attorney Christian. A notary public was called in to take her affidavit. He asked her if she understood the contents of the document and she said that she did, whereupon he took her acknowledgment.

"Attorney Christian again failed to make any inquiry of Miss Mills as to her assets and her means of livelihood. So far as he knew, she had not received any independent advice from any friend or attorney.

"Miss Mills stated that she was very distraught at the time she was in Attorney Christian's office on the afternoon of May 19. She knew her sister was dying and stated that she could not think clearly. She testified that she buried her head in her hands and that everyone was urging her to sign the document. She admits that the document was read to her, but stated that she did not understand it or its consequences, but signed it because everyone told her to sign it."

[2] Warren Hendricks, Theophilus Larsen, Edith Thomas, Dorothy S. Birch and Liston Sewer referred to in Civil No. 154–1958 (Mills v. Hendricks (D.C. V.I. 1959) 4 V.I. 19).

## The Respondent avers the facts to be as follows:

"That on or about May 18, 1958, the defendant was called to the bedside of LUCILLE SEWER at her home by one WARREN HENDRICKS, to confer on the making of a Will. When the defendant arrived at the home of Mrs. Sewer she told him that he should come back the following day. On the following day, the defendant did not return to the home of Mrs. Sewer, but was called to the hospital where Mrs. Sewer had been taken, and told that she had called for him to make her Will. Upon arriving at the hospital and seeing the condition of Mrs. Sewer, the defendant asked her doctor, Dr. Cole, if she was in a condition that she could make a Will at that time. The defendant was told "NO" and immediately left the hospital and returned to his office.

"That about one hour after, two or three of the children raised by Mrs. Sewer as foster children from the time they were young, and Lillian Mills, her sister, came in to the office of the defendant and told him that they had agreed that whatever Miss Mills would inherit from her sister's estate, Miss Mills had agreed to give to the five children on the ground that they were raised by her sister from the time they were young, and two of them were related to both Mrs. Sewer and Miss Mills, and asking if the defendant would reduce this agreement to writing. This request was made by all of the persons, including Miss Mills appearing at the office at the time as members of a single family. They also asked when the document could be ready, as they preferred it to be executed before the death of Mrs. Sewer. This was about ten o'clock in the morning. They were told that the document could be ready about 5:30 the afternoon of that same day, but that since it had to do with the transfer of property interests, it should be properly witnessed and notarized. It was agreed that the defendant would contact a notary and have him available for the purpose. Again at 5:30 that day, the aforesaid persons came to the office of the defendant for the execution of the paper. The attorney, the notary, and two other witnesses were present. Copies of the document were distributed to each of the persons present, including Miss Mills. The defendant read and explained the document to her while she had a copy in her hand. After stating she understood what it said, as she requested written that morning, she signed the document in the presence of the persons present. The notary then came in and asked her if she understood what it was about, and she again said "Yes" she understood what it was about, giving in substance the contents of the document

252

in her own words. The notary thereupon took her acknowledgment. In addition to the fact that this document was drawn at the request of Miss Mills appearing with other persons as a part of their family, and the fact that she was in defendant's office not just the afternoon of the execution, but both the morning and the afternoon for the same purpose, the defendant alleges that at no time did Miss Mills appear upset, distraught or in any way not to be fully aware of what she was doing, nor at any time did Miss Mills put her face in her hands and cry in the presence of anyone. This atmosphere is the exact opposite of the atmosphere that prevailed in the defendant's office both during the morning and during the afternoon sessions of the day the document was executed. The atmosphere was one of pleasantness, friendliness, and a desire on the part of all concerned, including Miss Mills, to have the attorney draw the document in question. It was not until two weeks later, after the death of Mrs. Sewer and the arrival here of the son of Miss Mills who knew he had all to gain by a cancellation of the document and the ownership of the properties by his mother, that Miss Mills completely changed her attitude and her story concerning what she wanted done with her inheritance from her sister's estate. Evidently, by that time she had been completely informed as to how to change the facts as they occurred in the case."

On August 20, 1958, Lillian Mills, through her counsel Birch and Maduro, Esquires (John L. Maduro, Esquire, of counsel), filed a civil action in this Court for cancellation of the document in question, against the foster children of her sister, Lucille Sewer, who died on May 20, 1958, the day after the document was executed.

On June 10, 1959, the Court entered an opinion cancelling the document. Among other things, the Court said: "Upon a review of all the evidence and facts surrounding the execution of the document in question, the Court has no hesitancy in the finding that the petitioner (Lillian Mills) was imposed upon and was in no condition to realize, and did not realize, the significance of the document she signed." (Mills v. Hendricks, 4 V.I. 19.)

Instead of trying to right the wrong which had been done to Lillian Mills, and repair the damage done to her by the

execution of the document she signed, the respondent appeared in Court on behalf of those who had retained him, the foster children, and endeavored to uphold the validity of the document although he knew at that time, or should have known, that at the time of the execution of the document Lillian Mills was an elderly woman unskilled in the law, in a mentally distraught condition by reason of the extreme illness of her sister Lucille Sewer, and that enforcement of the document would pauperize her. He also knew that Lillian Mills had signed the agreement without the advice of counsel or friend, and that as soon as she had obtained such advice she repudiated the document.

■ Since the respondent demanded the Grievance Committee to furnish him with a statement of the specific canons of ethics he is alleged to have violated, and the Grievance Committee in response thereto having referred to Canons Nos. 6, 8, 15, 16, 32 and 41, the Court will comment on these canons as they apply to the facts in this case.

CANON 6 reads as follows:

"ADVERSE INFLUENCES AND CONFLICTING INTERESTS

"It is the duty of a lawyer at the time of retainer to disclose to the client all the circumstances of his relations to the parties, and any interest in or connection with the controversy, which might influence the client in the selection of counsel.

"It is unprofessional to represent conflicting interests, except by express consent of all concerned given after a full disclosure of the facts. Within the meaning of this canon, a lawyer represents conflicting interests when, in behalf of one client, it is his duty to contend for that which duty to another client requires him to oppose.

"The obligation to represent the client with undivided fidelity and not to divulge his secrets or confidences forbids also the subsequent acceptance of retainers or employment from others in matters adversely affecting any

interest of the client with respect to which confidence has been reposed."

The complaint alleges that on May 18, 1958, the respondent was called to the home of Lucille Sewer to make a will and found her sick and in such condition she could not make a will. The same condition obtained on May 19, 1958 at the hospital and respondent was unable to discuss anything with Lucille Sewer concerning the will. The respondent admitted these allegations in his answer.

The respondent in his brief in Civil No. 154-1958 (Mills v. Hendricks (D.C.V.I. 1959) 4 V.I. 19) stated that Warren Hendricks and Theophilus Larsen called at his office on May 19, 1958, and discussed how the properties of Lucille Sewer could be arranged so that they, the foster children, could inherit them. At the time the respondent had not talked to Lillian Mills. He testified that Lillian Mills came to his office on the morning of May 19, 1958 with Hendricks and others, but this was denied by Miss Mills by her testimony in the case as well as in the action above mentioned for cancellation of the document. The respondent testified that he considered the foster children and Lillian Mills one happy family and that he represented all of them, including Miss Mills, although Miss Mills had never engaged him to represent her. He also testified that he received the sum of $50 for his services, but could not remember who paid it to him.

It is obvious to the Court that the respondent was representing the foster children's interest and not Lillian Mills. It is clear if you take his testimony in this case and by his pleadings that it was one happy family, there was a violation of Canon 6 on conflict of interest, in not properly advising Lillian Mills and by defending against her in the cancellation suit, and the Court so finds.

255

CANON 8 provides that:

"ADVISING UPON THE MERITS OF A CLIENT'S CAUSE

"A lawyer should endeavor to obtain full knowledge of his client's cause before advising thereon, and is bound to give a candid opinion of the merits and probable result of pending or contemplated litigation. The miscarriages to which justice is subject, by reason of surprises and disappointments in evidence and witnesses, and through mistakes of juries and errors of Courts, even though only occasional, admonish lawyers to beware of bold and confident assurances to clients, especially where the employment may depend upon such assurance. Whenever the controversy will admit of fair adjustment, the client should be advised to avoid or to end the litigation."

The respondent testified that he represented all the parties including Lillian Mills (which she denied) ; that he had never prepared such a document before, and did not look up the principles of law involved in such cases before advising Miss Mills and the foster children of the law governing the case.

Since Lillian Mills secured counsel and repudiated the document in question the respondent did not advise anyone, including the foster children, by way of a candid opinion of the merits and probable result of litigation nor did he suggest to his clients, the foster children, that they desist from maintaining the validity of the document. By nature of the charges the Court must scrutinize the conduct of the respondent in relation to all of the parties concerned. The Court finds there has been a violation of Canon 8.

CANON 15 provides as follows:

"HOW FAR A LAWYER MAY GO IN SUPPORTING A CLIENT'S CAUSE

"Nothing operates more certainly to create or to foster popular prejudice against lawyers as a class, and to deprive the profession of that full measure of public esteem

and confidence which belongs to the proper discharge of its duties than does the false claim, often set up by the unscrupulous in defense of questionable transactions, that it is the duty of the lawyer to do whatever may enable him to succeed in winning his client's cause.

"It is improper for a lawyer to assert in argument his personal belief in his client's innocence or in the justice of his cause.

"The lawyer owes 'entire devotion to the interest of the client, warm zeal in the maintenance and defense of his rights and the exertion of his utmost learning and ability,' to the end that nothing be taken or be withheld from him, save by the rules of law, legally applied. No fear of judicial disfavor or public unpopularity should restrain him from the full discharge of his duty. In the judicial forum the client is entitled to the benefit of any and every remedy and defense that is authorized by the law of the land, and he may expect his lawyer to assert every such remedy or defense. But it is steadfastly to be borne in mind that the great trust of the lawyer, is to be performed within and not without the bounds of the law. The office of attorney does not permit, much less does it demand of him for any client, violation of law or any manner of fraud or chicane. He must obey his own conscience and not that of his client."

This canon in substance states how far an attorney may go in supporting a client's cause. The Court has quoted all of this canon so that it might not be misunderstood in relation to the respondent. The evidence adduced in this case by both sides makes it abundantly clear that the conduct of the respondent went beyond the scope of duty to his client, by execution of a document pauperizing an elderly woman whose only income was from taking in laundry; she lived in a one room home and at the time she was approached by the respondent's client she was under great mental strain due to the severe illness of her only sister. While the respondent's client did not call upon the respondent to violate the law he did call upon him to prepare a document trans-

ferring an inheritance before the death of a person from whom the inheritance would come. Also the respondent's client or clients did not have any legal right to the property of Lucille Sewer and gave no consideration to the heir of Lucille Sewer. The Court finds that the course of conduct of the respondent was contrary to good conscience and a violation of Canon 15.

CANON 16 provides as follows:

"RESTRAINING CLIENTS FROM IMPROPRIETIES

"A lawyer should use his best efforts to restrain and to prevent his clients from doing those things which the lawyer himself ought not to do, particularly with reference to their conduct towards Court, judicial officers, jurors, witnesses and suitors. If a client persists in such wrongdoing the lawyer should terminate their relation."

The foster children, or Theophilus Larsen and Warren Hendricks, came to the respondent on the morning of the day of the preparation of the document in question. The respondent knew the circumstances under which he was preparing the document requested by Hendricks. He knew or should have inquired into the financial condition of the heir apparent and he also knew or should have known that the document Hendricks asked him to prepare would strip the heir apparent of all her rights for no consideration whatsoever, and, further, that she was a poor woman of advanced age. He should have known that Hendricks was asking him to do something that he, Hendricks, should have been advised against and that the respondent should not have prepared such a document under the circumstances.

Again, after the respondent prepared the document and had it executed, when it was questioned and attacked, and conferences and discussions were held with him by counsel representing Lillian Mills, he made no effort to right the wrong that he was a party to. On the contrary, he proceeded

to probate the estate of Lucille Sewer relying upon the questioned document and subsequently defended the validity of the document in the suit that was filed by Lillian Mills for its cancellation.

Even after the Court decreed that the document was cancelled and Lillian Mills released from the unconscionable instrument, we find the respondent still defending his conduct, as the pleadings would show. It is the finding of this Court that the respondent violated Canon 16.

CANON 32 provides as follows:

### "THE LAWYER'S DUTY IN ITS LAST ANALYSIS

"No client, corporate or individual, however powerful, nor any cause, civil or political, however important, is entitled to receive nor should any lawyer render any service or advice involving disloyalty to the law whose ministers we are, or disrespect of the judicial office, which we are bound to uphold, or corruption of any person or persons exercising a public office or private trust, or deception or betrayal of the public. When rendering any such improper service or advice, the lawyer invites and merits stern and just condemnation. Correspondingly, he advances the honor of his profession and the best interests of his client when he renders service or gives advice tending to impress upon the client and his undertaking exact compliance with the strictest principles of moral law. He must also observe and advise his client to observe the statute law, though until a statute shall have been construed and interpreted by competent adjudication, he is free and entitled to advise as to its validity and as to what he conscientiously believes to be its just meaning and extent. But above all a lawyer will find his highest honor in a deserved reputation for fidelity to private trust and to public duty, as an honest man and as a patriotic and loyal citizen."

This canon of professional ethics has so much substance to guide a lawyer in his relation to the law and to his client that one familiar with it should be alert and aware of his

legal and moral responsibilities in serving and advising clients concerning their undertakings.

In the instant case the respondent testified, when asked why he rushed the preparation and execution of the questioned document under all the circumstances mentioned in this case, that his clients wanted it done before Lucille Sewer died, and, further, that since they had agreed he felt it should be done before anyone changed his mind. It is crystal clear that the only person who might change her mind was Miss Mills who was giving up everything. Certainly, his clients, the recipients of her bounty, would not change their minds since they were getting a large amount of property for nothing. The respondent in the light of all the facts of this case was under the obligation to advise all of the parties, and, particularly, Hendricks, Larsen and others who requested the document, the exact compliance with the strictest principles of moral law.

It is not necessary to repeat all the other aspects of the circumstances in this case as set out in other portions of this opinion to indicate that the respondent violated the Canon of Ethics 32 and the Court so finds.

CANON 41 provides as follows:

"DISCOVERY OF IMPOSITION AND DECEPTION

"When a lawyer discovers that some fraud or deception has been practiced, which has unjustly imposed upon the court or a party, he should endeavor to rectify it; at first by advising his client, and if his client refuses to forego the advantage thus unjustly gained, he should promptly inform the injured person or his counsel, so that they may take appropriate steps."

In the instant case after the document was prepared and executed the injured party, Lillian Mills, through her attorney communicated with the respondent by telephone and then in conference wherein the respondent knew that Miss Mills contended that she did not know what she was signing

and that she was willing to give the foster children "something", but not all that she would inherit. In the face of that conference, the respondent, as stated hereinbefore, proceeded to probate the estate and subsequently defended the validity of the questioned document in this Court. It is clear to this Court that his action was in violation of Canon 41, and the Court so finds.

The respondent testified in this case, and gave explanation of his conduct and finally admitted on the witness stand that he was wrong and had erred.

It is the conclusion of this Court that the conduct of Attorney Alphonso A. Christian, the respondent, was unethical and in violation of the Canons Nos. 6, 8, 15, 16, 32 and 41. Having so found, he will be reprimanded and judgment entered in accordance with the above. A date for the reprimand will be set.